In the Interest of R.M.

**Robert N. WATERS, Medical Director, North Dakota State Hospital, Petitioner and Appellee,**

v.

**R.M., Respondent and Appellant.**

**Civil No. 960314.**

Supreme Court of North Dakota.

Nov. 14, 1996.

James A. Wentz, of Kropp Law Offices, P.C., Jamestown, for respondent and appellant.

Charles J. Gilje, Special Assistant Attorney General, Jamestown, for petitioner and appellee.

NEUMANN, Justice.

R.M. appeals the district court's order committing him to continued treatment at the North Dakota State Hospital for a one-year period. We affirm the district court's order for continued treatment, but remand the case directing the district court to conduct further proceedings to consider the availability and appropriateness of alternative treatment as required under N.D.C.C. § 25–03.1–40(2).

On June 21, 1996, R.M. was admitted to the State Hospital for the thirty-sixth time. He was released five days later with a court order to participate in an alternative treatment program for ninety days. Under that order, R.M. was required to abstain from alcohol use, and to report to the Southeast Human Service Center in Fargo for psychiatric appointments and daily medication. Approximately one month later, on July 31, 1996, R.M. was readmitted to the State Hospital. On September 9, 1996, the State Hospital petitioned the court seeking continued treatment for R.M. The court found R.M. had not complied with his alternative treatment program and ordered him hospitalized until further disposition.

On September 18, 1996, the district court held a continuing treatment hearing. At the hearing, Dr. Theodore Rais, a psychiatrist at the State Hospital, testified R.M. suffers from a bipolar disorder and alcoholism, with a history of depression, violence, and episodes of manic behavior. Dr. Rais explained R.M. functions extremely well in a structured setting, but when R.M. is out of treatment, he returns to drinking and his mental health deteriorates. Dr. Rais recommended R.M. be placed in the Share House for one year to ensure he receives care and supervision to help him function in society.[1] The district court, finding R.M. to be mentally ill and chemically dependant, granted the petition. The court ordered R.M. be admitted to the State Hospital for one year, under its belief that R.M. needed to gain insight into his problems before an alternative program could be initiated.

R.M. appeals the district court's decision, arguing the State did not meet its burden of proving by clear and convincing evidence that R.M. requires continued treatment. Although Dr. Rais testified that without treatment R.M. will likely continue drinking and become depressed, R.M. argues this is not sufficient to order continued treatment under N.D.C.C. § 25–03.1–02(11) which mandates involuntary treatment only if a person's behavior poses a threat to himself or others. R.M. further argues an alternative treatment program, such as the Share House, would be unaffordable and inappropriate for him.

When reviewing an order for continued treatment, we are cautiously aware of the liberty interest at stake. In *In Interest of J.S.*, 530 N.W.2d 331, 333 (N.D.1995), we defined our standard of review by stating:

> "To balance the competing interests of protecting a mentally ill person and of preserving that person's liberty, our standards of decision require trial courts to use a clear and convincing standard of proof while we use a more probing 'clearly erroneous' standard of review. *Matter of Guardianship of Braaten*, 502 N.W.2d 512, 518 (N.D.1993). As we explained in *In Interest of R.N.*, 513 N.W.2d 370, 371 (N.D.1994), 'we will affirm an order for involuntary treatment unless it is induced by an erroneous view of the law or if we are firmly convinced it is not supported by clear and convincing evidence.'"

Under N.D.C.C. § 25–03.1–02(11), a person requiring treatment is a "person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property." Section 25–03.1–02(11), N.D.C.C., defines a "serious risk of harm" to exist when there is "substantial likelihood" of:

> "a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;
>
> b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;
>
> c. Substantial deterioration in physical health, or substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or
>
> d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

"Significantly, section 25–03.1–02(11)(d), N.D.C.C., specifically allows 'patterns in the person's treatment history' to be used as a basis for finding a 'serious risk of harm,' and we have further held '[a] court can use what has happened in the past as "prognostic" evidence to help predict future conduct.'" *In Interest of C.W.*, 552 N.W.2d 382, 384 (N.D.1996) (citing *In Interest of J.S.*, 545 N.W.2d 145, 149 (N.D.1996)).

R.M. suffers from a bipolar disorder and alcoholism. He has been admitted to the State Hospital thirty-seven times, including

---

1. The Share House is a facility in Fargo, similar to a halfway house, that combines residential programming with intense outpatient treatment.

his last admission. Although he has been in and out of treatment for more than twenty years, he has repeatedly returned to abusing alcohol, and has repeatedly needed to be readmitted for treatment due to his depressive and manic episodes. In June 1995, R.M. was convicted of D.U.I., and was also placed at the Share House for eleven months. Under supervision in the Share House, R.M. functioned extremely well. He was not drinking and was properly taking his medication. Three weeks after he was discharged, South East Human Services reported R.M. was drinking. Within a month, he was readmitted to the State Hospital for therapy. He was released in five days, and then again readmitted one month later. This evidences a continuous pattern of alcohol abuse and of deterioration in R.M.'s mental health when he is not under supervision.

Although many people suffering from alcoholism and a bipolar disorder function reasonably well in society and are not considered dangers to themselves or others, R.M.'s physical and psychological problems strongly suggest this is not so for him. In June 1996, a gun was found under R.M.'s pillow. In July 1996, R.M.'s sister reported that R.M. vandalized her van. Under the alternative treatment program, R.M. was ordered to report to Social Services for his medication, but according to Social Services, R.M. missed his medication on occasion. In August 1996, R.M. wrote to his home counselor, indicating he wanted to be left alone, and at the continuing treatment hearing, R.M. insisted he did not need any outside help. Besides alcoholism and bipolar illness, R.M. suffers from coronary artery disease and epilepsy. In consideration of R.M.'s D.U.I. conviction, his past aggressive behavior, his possession of a gun, his sister's report that R.M. vandalized her van, R.M.'s recent hostility toward his home counselor, and his physical condition, Dr. Rais testified R.M. needs supervision to learn to cope with his problems and function in society. He further testified that unless R.M. is treated, a high probability exists that R.M. will be aggressive in the future.

█ The district court granted the State Hospital's petition finding R.M. "suffers from a mental illness and chemical dependency which substantially impairs his capacity to use self-control, judgment and discretion ... which would predictably result in dangerousness to the respondent." After examining Dr. Rais' testimony, R.M.'s history in managing his illness, R.M.'s resistance to outpatient therapy, and the reports of R.M.'s aggressive behavior, the most distressing being his possession of a gun, we do not believe the district court was clearly erroneous in determining that, without treatment, there is a substantial likelihood of R.M.'s mental health deteriorating to an extent resulting in R.M. being a danger to himself or others.

Dr. Rais recommended, however, that R.M. should be placed in the Share House. South East Human Services Center in Fargo and R.M.'s family supported that recommendation. Yet, the district court ordered R.M. be committed to the State Hospital under its belief that R.M. needed to gain insight into his problems before an alternative program should be initiated. "Our statutory procedures are explicit that a mental health patient has the right '[t]o the least restrictive conditions necessary to achieve the purposes of treatment.'" *In the Interest of Goodwin,* 366 N.W.2d 809, 814 (N.D.1985) (citing N.D.C.C. § 25–03.1–40(2)). In *In the Interest of Goodwin,* 366 N.W.2d at 814, the appellant was committed to the State Hospital due to her lack of memory and inability to care for herself. Although a nursing home would have been suitable, the district court ordered continued treatment at the State Hospital because no appropriate state institution was available for alternative treatment. *Id.* We remanded the case under our statutory mandate to find the least restrictive conditions necessary to achieve the purposes of treatment, and ordered the court to consider "the availability and appropriateness of alternative treatment in a less restrictive institution." *Id.* at 815. In our ruling, we said:

> "Here, the evidence is far from clear and convincing that commitment to the State Hospital is necessary in view of the physician's testimony that a nursing home would be suitable, if financial assistance were available. Where there is an available 'treatment program other than hospitalization ... adequate to meet the respon-

dent's needs and ... sufficient to prevent harm ...,' she is entitled to an order of alternative treatment; N.D.C.C. § 25–03.1–21.

Poverty is not a criterion for commitment. Financial circumstances may be relevant to 'availability' of an alternative treatment program. 'Availability' of an apparent alternative was not adequately addressed in the evidence before the trial court for its finding that 'the only alternative available at this point and time is the State Hospital." *Id.* at 814–15.

The situation presented to us in *In Interest of Goodwin* is analogous to this case. The district court ordered R.M. committed to the State Hospital even though Dr. Rais and South East Human Services in Fargo recommended he be placed in the Share House. Although R.M. needs treatment, we believe the least restrictive treatment program should be provided. R.M. indicated he does not want to be placed in the Share House due to the costs, but according to the record, no one has investigated the possibilities of the Share House or other similar facility for

R.M. We do not know whether such a placement is available or feasible. Furthermore, R.M.'s position against living in the Share House was taken in light of the fact he was appealing his involuntary commitment. In consideration of our affirmation of the district court's decision, R.M. may prefer the alternative treatment.

We, therefore, affirm the district court's order for continued treatment, but remand the case directing the court to conduct further proceedings considering the statutory requirement that the availability and appropriateness of alternative treatment must be fairly considered.

MARING, MESCHKE, SANDSTROM and VANDE WALLE, C.J.